# BROWN v. BEESON.
## 218 S. W. (2d) 997.

Eastern Section.   November 10, 1948.

Petition for Certiorari denied by Supreme Court, March 11, 1949.

Kolwyck & Clark, of Chattanooga, for appellant.

Jas. J. Griffiss and C. G. Milligan, both of Chattanooga, for appellee.

McAMIS, J.   Mrs. Jennie Beeson appeals from a decree for $840 found by the Chancellor to be due complainant as real estate commissions.   It is insisted that commissions were paid by defendant to Lewis Duncan, another broker, for the sale of the property; that if there was a listing to complainant it was not an exclusive listing; that complainant did not find a buyer until after the contract had expired; that there was no extension of the contract and that complainant cannot recover because his efforts were expended in behalf of the prospective buyer and not in behalf of defendant.

On May 2, 1946, defendant, a resident of Torrington, Wyoming, was the owner of a one-fourth interest in a lot on Market Street in Chattanooga.   On that date.

having previously bound herself to sell to her cotenants if they would meet any offer she might receive from third parties, Mrs. Beeson had her attorney in Torrington write separate letters to complainant and Duncan, another Chattanooga broker, inviting each of them to submit any offer they could obtain from their "clients" in excess of $15,000, the highest offer previously made by her cotenants. The letter to complainant contained the following:

"We are prepared to accept this offer (from cotenants) of $15,000.00 net unless we can do better within the next week. If you should have a client who might wish to submit an offer above this $15,000.00 we would consider it. In the event that your client should offer say $18,000.00 including real estate commissions and the other heirs should meet the offer we would consider that you would be entitled to the commission."

Substantially the same language appears in the letter to Duncan. Neither knew, however, that the services of the other had been engaged until after a sale was made to the cotenants at $18,000. The letters bear date of May 2, 1946, as above indicated.

On May 6th, Duncan, by long distance telephone, submitted to defendant's attorney an offer of $18,000 from a client whose name he refused to divulge. The attorney replied by wire at 9:29 A.M., May 7th: "We will accept offer of eighteen thousand . . . Providing heirs do not meet your offer by Wednesday fifteenth."

It is apparent from this wire (1) that Mrs. Beeson intended to sell either to the cotenants or to Duncan's client four days before complainant's contract was to expire on May 11th and (2) that defendant, whatever her original intention as to the ultimate date for closing a

sale of the property, had then determined upon May 15th as the final closing date. The latter conclusion is amply supported by other wires from her attorney, as will appear.

The attorney simultaneously wired the cotenants: "We have received an offer of Eighteen Thousand . . . which we will accept unless offer is met by heirs on or before May 14th."

On the same date but at a later hour, the attorney dispatched the following wire to complainant: "Definitely going to sell property. Best offer to be accepted May 15."

The telegram to complainant was in reply to one from complainant dated the preceding day, May 6th, stating: "I have an offer substantially better than the one you have but client does not want it submitted unless your client is ready to sell."

We think the only reasonable construction of defendant's wire of May 7th to complainant is that any offer submitted by his client would be considered if made on or before May 15th. It is immaterial whether it operated to extend the original agreement or whether it be considered as shedding light on that agreement and excluding the idea that time was ever considered of the essence. It must be assumed that it was intended to have some meaning and we think complainant was justified in continuing his efforts in the expectations that he would be compensated under the terms of the contract as outlined in the letter of May 2, 1946.

Defendant has offered no explanation for thus inducing complainant to continue his efforts after seemingly having indicated her intention to accept the offer of Duncan's client or an offer of the same amount from the

cotenants. Nor is there any explanation of defendant's failure to notify complainant that she so intended and would not perform her agreement, as it then stood, to allow complainant until May 11th to submit an offer. It may be that defendant wanted to know the amount of the "substantially better" offer from complainant's client referred to in his wire of the preceding day and that she was willing to gamble on having to pay two commissions against the possibility of receiving a bid in excess of $18,000 which the cotenants would be expected to meet if they were to get the property. Again, she may have had in mind that complainant's contract was still in force and would not expire at the earliest until May 11th. The motive is unimportant except as it reflects upon defendant's good faith. Whatever the motive the wire of May 7th bound defendant to pay for the services to be rendered under the contract.

On the same date, May 7th, after receiving the wire, complainant wired in reply: "Thanks for wire stop will submit offer before May 15th." As the Chancellor commented, there was no dissent from complainant's manifest understanding that he was to have until the 15th for the submission of his client's offer. An offer of $18,000 by a responsible buyer who deposited $1,000 as evidence of good faith was submitted by wire on the 13th. The offer was subject to acceptance by the close of business on the 15th. It was never acknowledged and later inquiries in regard to payment of commissions brought no satisfactory reply.

We do not see that any attempt to settle the question of whether the contract sued upon was, or was not, an exclusive listing contract would be helpful. In the true sense, it was not a listing contract. Defendant was

already conditionally bound to sell to the cotenants. In that event, and as it turned out, no sale could be made to complainant's client or due to his efforts. From defendant's standpoint the primary purpose of the contract was to boost the price of the property by forcing the cotenants to pay more or, if they refused to pay more, by selling to a third party at a higher price. Doubtless realizing that a broker would not be interested in working up a sale only to lose it by having the cotenants match the offer of his client, it was clearly stated in the original letter that in that event it would be considered that complainant would be entitled to commissions. Whatever called, complainant had only to carry out the terms of his undertaking to earn a commission and we think it would be treacherous to attempt to apply to the peculiar contract here involved principles and authorities governing the usual form of listing contracts contemplating only a sale of the property and the payment of commissions upon completion of the sale.

However, if we assume, as defendant insists, that the governing principles are the same, it seems to us that a case not unlike Woodall v. Foster, 91 Tenn. 195, 18 S. W. 241, 242, relied upon by complainant, is presented. In that case the owner, having listed his property with a real estate broker, but without giving the broker the exclusive right to sell, sold the property himself but failed to notify the broker who by diligent efforts thereafter produced a purchaser able, willing and ready to buy. The court said:

"It is true the defendants had the right to sell the property themselves, as they did, and that the sale, rightfully made by them, necessarily prevented the completion of the subsequent sale, put on foot by plaintiffs;

but it by no means follows that plaintiffs were thereby deprived of their right to compensation. When defendants sold the property it became their duty to notify plaintiffs of that fact, and until that was done the contract relation between them continued.''

To apply the clear holding in that case to this, if defendant considered the bid of Duncan's client satisfactory and intended to accept it as the basis for selling the property either to Duncan's client or to the cotenants; she should have notified complainant that his services were not longer required—that the property was considered sold. But she did exactly the reverse of that. She encouraged complainant to continue his efforts and extended the original time from May 11th to May 15th. Having failed to bring forward any explanation of her course of action, we are justified in viewing it in the most unfavorable aspect and in concluding that by using the services of both Duncan and complainant she intended by indicating an acceptance of Duncan's offer to be assured of a sale at that price and, at the same time, hope for a still higher offer from complainant's client which the cotenants would have to meet or lose the property. She cannot be permitted in this way to play both fast and loose. When complainant, within the time as extended, produced a bona fide bid and defendant sold to the cotenants at the price bid, complainant, under the terms of the contract, became entitled to commission.

We are unable to see that the payment of commissions to Duncan has any bearing on complainant's rights. It is true he produced the first bid of $18,000. But this was unknown to complainant who was never told that Duncan was also trying to secure bidders. With knowledge

of the bid and that Duncan would be entitled to commissions defendant encouraged complainant to continue his efforts, as we construe the telegram of May 7th, extending the time for performance to May 15th.

■■ We do not think complainant should be denied commissions on the ground that he was acting jointly for the prospective purchaser and for defendant. The rule is well settled that a broker cannot earn a commission while representing an adverse interest. There is a well recognized exception, however, that commissions may be due if the employer had full knowledge that the broker was also representing the other party to the transaction. 12 C. J. S., Brokers, sec. 43, page 105. In this case, the telegrams indicate that defendant knew she was dealing with complainant's "clients" whose interests were, of course, adverse to her own. Moreover, there is nothing to indicate that the case was tried before the Chancellor on that theory. Nor is there more than a bare inference that complainant would have been entitled to commissions from the purchaser if the bid had been accepted. We think in the absence of pleading and affirmative proof commissions should not be denied on that ground when the defense is interposed for the first time on appeal.

The cause will be remanded for necessary orders and for a decree in the amount heretofore rendered with interest and costs.

Howard and Goodman, JJ., concur.