ANNIE A. BELL v. MERLE W. STRAUCH, et ux.
ANNIE A. BELL v. HARRY A. BLOOMFIELD, et ux.
—292 S. W. (2d) 59.

Western Section. September 23, 1954.

Petition for Certiorari denied by Supreme Court March 11, 1955.

Rosenfield, Borod, Fones & Bogatin, William W. Goodman and Herbert Glazer, Memphis, for appellants.

Livingston, Vineyard & Sherman, Memphis, for appellee Bell.

AVERY, P. J., (Western Section). This appeal involves two suits, both brought by Annie A. Bell, a resident of Shelby County, Tennessee. One suit is against Merle W. Strauch and his wife Jane H. Strauch. The other is against Harry Bloomfield and his wife Madie W. Bloomfield. In each of these cases the complainant seeks

to recover of the respective defendants, commissions which she claims are due her, as a real estate broker. The two cases were consolidated and tried together before the Honorable L. D. Bejach, Chancellor, upon oral testimony and by such consolidation and consent of the parties both cases are heard in this Court upon a single transcript of the record.

The case against Merle W. Strauch and wife was filed on May 19, and the case against Harry Bloomfield and wife was filed on May 22, both in 1953, and in this Opinion where we have the expression "First Case" it refers to that against Strauch and wife, and where we have the expression "Second Case" it refers to the one against Bloomfield and wife.

In the first case the complainant alleges that Strauch and wife owned part of lot No. 3 of the Camilla-DeBose Sub-Division and that they came to her on about February 25, 1953, requesting that she attempt to locate a suitable residence for them and in doing so it would be necessary for them to sell the above referred to property; that defendants in the first case agreed to pay complainant the usual real estate commission in event she secured a purchaser for their property; that soon thereafter she notified the defendants in the first case that she had found for sale real estate located at 4360 Chickasaw Road owned by defendants in the second case, which she would like them to see; that Strauch and wife approved the desirability of the property located at 4360 Chickasaw Road for their home; that complainant carried on negotiations between the Strauch's and the Bloomfield's relating to the exchange of their respective property and on about March 9, 1953, defendants in the first case notified her that they had executed a contract with defendants in

the second case and that they did not intend to pay complainant commission for her service; that the contract was actually consumated, and defendants in the first case conveyed their referred to property to defendants in the second case, for the consideration of $55,000; that she thereupon demanded the regular real estate commission originally agreed upon, payment of which was refused, and which resulted in the filing of this suit, wherein she seeks to recover $2,150, being the usual commission in similar transaction in that community.

The defendants in the first case filed their answer in which they admit that the property at 4360 Chickasaw Road belonging to the Bloomfield's was shown to them by complainant and her husband and that they expressed an interest in acquiring that property. They deny that they promised or agreed to pay any commission unless the complainant completed a transaction after first obtaining an offer which was acceptable to them. They admit the ownership of the property referred to in the bill and that they did acquire through another real estate agent the property located at 4360 Chickasaw Road, exchanging the Poplar Avenue property therefor. They contend that complainant sought to have them pay commissions upon the tradein value of both properties, which they say was not agreeable to them at all and to which they never agreed, but that the other real estate agent did provide them with an acceptable contract whereby the trade was made.

In the suit against the Bloomfields, complainant claims that they employed her as their agent for the sale of the property at 4360 Chickasaw Road, and agreed to pay the complainant a commission in event she should secure a purchaser for such real estate; that at the time of this

employment as their real estate agent the Bloomfield's property had been listed with one Norman Eisenberg, with whom complainant was not permitted to participate in a division of the commission, and that this fact was called to the attention of these defendants, who assured complainant that they would pay her the usual commission in event she should secure a purchaser for said real estate; that thereafter she informed them that she had located a possible purchaser and with their consent she showed this property to Strauch and wife on March 2, 1953; that on March 9, 1953, the defendants in the second case informed complainant that a contract had been executed with Strauch and wife through another agent and that defendant did not intend to pay her any commission for her services; that about April 13, 1953 this contract for the sale of the Bloomfield property was consummated and deed made to said Strauch and wife for a consideration of $65,000; that she demanded her commission, which was refused, and which refusal resulted in this suit wherein she seeks to recover $2,450, being the usual commission in similar transactions in that community.

The Bloomfields filed their answer admitting the ownership of the property at 4360 Chickasaw Road, at the time alleged in the bill; deny that in January 1953 they employed complainant as their agent for the sale of said property and deny that they agreed to pay complainant any commission. They state that complainant and her husband, in January of 1953, requested permission to show said property to the prospective purchasers, and at that time told her that the said real estate had been listed exclusively with Norman Eisenberg; that they would have to pay full commissions to Eisenberg in event

of the sale and that defendants would pay no other commissions, averring that they told complainant that Mrs. Hall, who was associated with Norman Eisenberg was actively soliciting purchasers for the property and that they were offering it at $80,000 and that if Mrs. Hall gave her permission to show the property to prospective purchasers that would be satisfactory.

They admit that on or about March 2, 1953, complainant contacted them and informed them that she had located a possible purchaser, and that Mrs. Hall said it was agreeable with her for complainant to show the house to these prospective purchasers. Defendants deny that at that time they reaffirmed the contract with complainant for the payment of the commissions. They admit that the property was shown by complainant by Strauch's wife on March 2, 1953, and that some days thereafter to her husband Mr. Strauch; they deny that complainant ever presented them with a contract which was acceptable to them; they deny that they were guilty of any fraud in the transaction or that they owed Mrs. Bell any commission.

As before stated these cases were consolidated by proper order and by consent of the parties and the cause was heard on January 15, 1954, upon oral testimony and the Chancellor found that the complainant had carried the burden of making out her cases, as alleged in her respective bills, and rendered judgment in the first case in favor of complainant and against Strauch and wife, for the sum of $2,150, with interest from May 19, 1953, and in the second case against Bloomfield and wife for $2,450, interest from May 22, 1953, each at 6% per annum, and amounting to $84.56 in the first case and $95.15 in the second case and thereby making a total judgment in

the first case of $2,234.56 and a total judgment in the second case of $2,545.15.

Both defendants prayed an appeal, perfected it to this Court, filed a Bill of Exceptions with the transcript and have assigned errors.

The learned Chancellor filed his finding of facts, consisting of seven pages, typewritten, in the first paragraph of which he said:

"In the opinion of the Court, the decision of this case turns primarily, if not exclusively, on the issue of veracity between the witnesses for the Complainants and the Defendants, and more especially between the testimony of the Complainants themselves and of the Defendants themselves."

The Court found that in the negotiations for the exchange of the properties carried on between all the defendants with Mrs. Bell, that Strauch insisted on certain changes being made in the Bloomfield property, including certain additions and that Bloomfield agreed to make these changes but did not do so, and pay the commissions, whereupon request was made by Mrs. Bell to Strauch, to pay both commissions, and the proposed contract was written up in that form. In the opinion the Court further said:

"Now in the opinion of the Court, this is clearly and definitely not a case where different real estate agents all were trying to sell the same property, and the one that first produces a contract is the one that is entitled to prevail. This is clearly a case where the Defendants deliberately and intentionally and purposefully undertook to short circuit or circum-

vent the Complainants from getting their reasonable and just compensation."

After further commenting upon the testimony of the parties and their witnesses, and the argument of counsel, the Court further found and said:

"But whatever other reason the Court finds as a fact that the Defendant Bloomfield and the Defendant Strauch did conspire together to short circuit and prevent the Bells from collecting commissions in this transaction."

This record reveals the fact that both Mr. Strauch and Mr. Bloomfield regarded the Bells as their respective agents and representatives in the transaction, and that each knew that the other so regarded the Bells. In other words, Strauch knew that the Bells were acting as his agent and that the Bells were acting for Bloomfield as his agent and Bloomfield knew that the Bells were acting as his agents and that they were acting as the agents of Strauch. Both Mr. and Mrs. Bell testified to the fact that there was no concealment of their representation of each of the parties, but on the contrary positively state that they told each of the parties about their representation of the other. We think the statements of Bloomfield and Strauch are conclusive at this point and certainly the circumstances detailed by each of them corroborate the statements of Mr. and Mrs. Bell.

Many quotations from the testimony could be here made to substantiate this finding, but we here quote just a few. The questions to and answers by Mr. Strauch are as follows:

392

"Q. Did you regard Mr. and Mrs. Bell as your agents and as your representatives in this transaction? A. Absolutely not. If they were they would have been paid.

"Q. Well, I mean during the negotiations. A. Oh, yes.

"Q. I don't mean in the consummation of the contract. A. Yes, we were working with them as client and agent, yes. They were hustling us around or we were riding around with them.

"Q. Did you expect them to act in your behalf as your agent? A. I certainly did." (Dir. Examination R. 205.)

After Mrs. Strauch had been carried to see the Bloomfield's property by the Bells, Mr. Strauch returned from California and he testified that his wife told him about having gone with the Bells to see the Bloomfield's property. He was then asked and answered the following questions:

"Q. On your return to Memphis I believe you state that you found that your wife and the Bells had looked at the house belonging to the Bloomfields.

A. I did.

"Q. Were you then requested by either of the Bells to look at the house yourself? A. I was.

"Q. At that time did you assume they were acting for you as your agent? A. Yes.

"Q. At that time had any discussion been held as to the commissions that you might be expected to pay? A. No.

"Q. But you did consider them as your agents?
A. I certainly did. I am not in the habit of going around people on commissions.

"Q. And throughout the negotiations up to the time that Mr. Avery came into the picture you considered the Bells as your agents? A. Right.

"Q. Did you accompany Mr. or Mrs. Bell to the Bloomfield property? A. I did." (R. 207 Cross-Examination.)

"Q. Let me ask you if you recall going into the attic of the house, where the air-conditioning machinery was located, and inquiring as to certain particulars as to the air-conditioning unit? A. Yes, I do; and Mr. Bloomfield was there that night.

"Q. It was, then, Mr. Bloomfield who showed you through the house was it not? A. Yes, sir.

"Q. And was it Mr. Bloomfield who explained to you the mechanical setup with respect to the air-conditioning? A. That was what called it to my mind, because I went over the mechanical phase of it." (R. 208-209.)

Mr. Strauch then explained the conversation that he had with reference to the porch and the enclosure of that porch, and some other items that he desired completed concerning which he was asked and replied as follows:

"Q. Was that not discussed with Mr. Bloomfield prior to the time that Mr. Avery came into the picture? A. Yes, it must have been discussed because I made mention of this to Mrs. Bell, of my desire in that direction, but, you see, this is an item

there, that whether it was mentioned originally to me by someone with interest in the house, that it would be closed in, or whether it was my suggestion, what I would like, I don't know, but in any event it was eventually worked out." (R. p. 211 Cross-Examination.)

With reference to another meeting with Bloomfield, Mr. Strauch was asked and testified as follows:

"Q. I believe you stated that one or two days later, to the best of your recollection Mr. Bloomfield came over to look at your house? A. Yes, sir.

"Q. Was that in the day or in the night? A. In the night time.

"Q. Who accompanied Mr. Bloomfield? A. Mr. Bell.

"Q. Did you then show Mr. Bloomfield completely through your house? A. Yes, sir.

"Q. Did Mr. Bell accompany you two in the showing? A. Yes, sir. He was right there."

Mr. Strauch was then interrogated about the next step in connection with the transaction and during that inquiry he was asked and answered:

"Q. What was the next step in which you were involved? A. The next step where I was involved I believe was when they delivered me the contract.

"Q. Had there not been some discussion prior to the actual delivery of the contract between you and the Bells as to the price or figure at which your house might be traded and the price or figure at which the Bloomfield's might be purchased? A. Yes, there

was first, a $5,000 thought that Mrs. Bell, I believe, talked to Mr. Bloomfield about and apparently it was rejected and then it came back with this $10,000 difference * * *.

"Q. At that time you indicated that $10,000 difference would be acceptable to you, did you not? A. Yes, sir.

"Q. At that time no question or discussion had been raised between you and the Bells as to what amount of commission would be charged, is that correct? A. That is correct.

"Q. At the time the so-called contract was presented to you for your examination and signature you noted that two commissions were going to be charged against you if that contract was consummated, is that correct? A. That's correct.

"Q. And that is the first time that you had in mind that you would pay two commissions? A. That is the first I knew of the $4600. You know, when you are not a real estate man the word "commissions" doesn't mean anything to you like the amount does.

"Q. In other words, you were willing to pay a commission but at that time you discovered that the amount of commissions which was being sought was what you considered to be excessive? A. Yes, sir.

"Q. Prior to that time you had considered the Bells as your agents and were willing to pay a commission? A. Yes, sir." (R. 213-214.)

In connection with the same relationship of agency of the Bells to Bloomfields it becomes necessary to briefly quote some of Bloomfield's testimony:

"Q. Now, did you ever authorize Annie Bell or Randolph Bell to show your house to anyone and if so what did you tell them to do? A. Yes, I authorized her to show the house. They called me about it and I told them at that time they would have to get any commission on the house, that would have to be payable by whoever they sold the house to, that I had my agency with Norman Eisenberg and had to pay that commission regardless, that if they had been a member of the Board that would have been a split commission, but being as they weren't I would have my full commission to pay and they would have to collect it from the other party.

"Q. When they first came to you about your house what price did you tell them you were asking? A. Eighty thousand dollars.

"Q. Did you later reduce that price? A. Yes, I agreed to take a net of $65,000.

"Q. And did you have occasion to go over and look at the property that the Strauch's owned at 3983 Poplar? A. Yes. Mr. Bell called me several times about the thing and asked me if I wouldn't go over there and finally I agreed to go over there and look at it. As I remember it, it was sometime between nine and ten o'clock at night he finally convinced me I ought to go and look at the property and I already told him if any trade were made he could collect his commission from the other party and I would pay mine and that is the way the thing would be handled, even on the trade. He could collect his money on the trade from the person who was doing the trading in." (Direct Examination R. 153.)

On cross-examination of Mr. Bloomfield he was asked and answered as follows:

"Q. Did you accept either Mr. Bell or Mrs. Bell as the agent when they brought Merle Strauch over to look at your house? A. I don't exactly know what you mean by accept them as an agent.

"Q. In discussing the details of the transaction with Merle Strauch, did you indicate to him that the Bells had authority to negotiate for the sale of your house? A. I had no negotiation with Merle Strauch at anytime. I guess you would say that I accepted Randolph Bell as an agent to try to sell the house because I did go over to look at Strauch's house. The first time that Mr. Bell brought Mr. Strauch in and, I was not present but I understood he was asked whether they had Mrs. Hall's permission and Mr. Bell said yes; I understand that, but I wasn't there."

"Q. The time that you went over to look at Merle Strauch's house with Bell, it was for the purpose of determining the value that you might give that house on a trade on your house, is that correct? A. That's correct. I had no objection to Mr. Bell selling the house at that time if he brought me the trade I wanted and if he brought me a contract." (R. 163-164.)

■ There is much other testimony by both Strauch and Bloomfield that strongly substantiates the positive testimony of Mr. and Mrs. Bell that they were acting for both Strauch and Bloomfield as their agents and that each of them knew that fact, and continued that relationship to the Bells up to the time Eugene Avery came into

the situation at the solicitation of Strauch and later by and with the consent and understanding of Bloomfield.

Complainant claims that, as representative of both Bloomfield and Strauch, there was an agreement reached, which was made known to the agent but not to each other, relative to commissions and who would pay same and that as the agent of Bloomfield, and at the suggestion of Bloomfield, she was submitting a contract to Strauch providing for payment by Strauch of both commissions and Avery came into the picture at that time, the value of each of the properties having been previously agreed upon and made known to each property owner.

Mr. Bell stated that he told Strauch that he would resubmit the contract to Bloomfield and find out if Mr. Bloomfield would take the amount of commissions which Strauch insisted on being taken off, from the original amount of the sale price of the Bloomfield property. He stated that Strauch would not let him submit such proposition because he, Strauch, said that Bloomfield wouldn't take it. He testified that Bloomfield had told him to try to get Strauch to pay both commissions, but that "If he will not do that, I will split that commission with him." He was asked:

"Q. Then whose agent were you? In whose interest were you acting? A. I was working for both of them.

"Q. You tried to get Strauch to pay more than he had to pay to make the deal, then, didn't you? A. No, you remember that the house, to begin with, was priced at $85,000 and Bloomfield agreed to take $65,000 for it." (R. p. 129-130.)

After the contract was submitted to Strauch:

"I tried to get Mr. Strauch to make the proposition back to Mr. Bloomfield, as I say, taking the amount he wanted to get off the commission off the price of the house, and he refused to let me do that, stating that he would get another agent who would work for less money than I would and the next time I called Mr. Strauch he said he had bought the home and it developed that the home had been purchased the day or second day after I had that conversation with him, so I had no opportunity for negotiation." (R. 132.)

Mr. Bell admitted that after Strauch had tried to get him to reduce the commissions to him, or tried to get him to agree to hand back certain commissions "under the table" and he had told Strauch that he wouldn't do that, but that he would try to get Bloomfield to reduce the original price of the property from $65,000 to $62,900 and in that way each party would pay his commission on his own house. He was asked the question:

"Q. All right. Now, with reference to this contract again, now, what you were suggesting that Mr. Strauch do was to reduce this figure from $65,000 and make it $62,900 and that would provide that each party would pay his commission on his own house? A. That's right. I just suggested to Mr. Strauch that we put it in another form other than cutting the commission. This was the whole issue of the entire conversation, was cutting the commission." (R. 137.)

Mr. Bell explained that this was the proposition which Strauch would not permit him to suggest to Bloomfield. Mr. Bell stated that the copy of the contract, Exhibit 1

to the testimony of Avery, was the only copy of the written contract ever delivered to Strauch for his signature, and that Bloomfield, when asked by Bell to sign the contract said:

"Get Strauch to sign it first." (R. 140.)

Relative to his conversation with the agent, Gene Avery, Mr. Bloomfield says that Gene Avery called him on March 8, 1953 and said:

"That was Sunday morning. I don't remember the date but on Sunday morning somebody called me to the phone and I answered the phone, and he said, 'This is Gene Avery, a real estate agent, and I would like to bring someone out to see your house.' I said, 'You will have to call Mrs. Hall. She is handling the property.' And he said, 'Well, I will get in contact with Mrs. Hall. I know Mrs. Hall; I will call her.' I said, 'If you do, I will be glad to open up the house for you.' " (R. 155.)

He relates how that sometime during the afternoon Mr. Avery came to his home, had his car in the driveway with someone in the back seat and requested Bloomfield to come out to the car, which he did and when he got there the person in the car was Mr. Strauch; that he was very much surprised to see him and that shortly thereafter Mrs. Hall, an associate with Norman Eisenberg and Company, came to the premises; that there was some conversation between Mr. Avery and Mrs. Hall; that Avery came back that same Sunday afternoon and inquired further of him about the house and what he would take for it and that he either came back with a written contract that Sunday night or the next morning; that Mrs. Hall called him and said she had a contract in

her office for him to sign, which is the contract in evidence here and which he did execute; that there was some discussion about the provisions of the contract, but that it was executed there at that time. He admits that in the conversation with Mr. Bell on Sunday night there was a very sharp statement made and that Bell told him that he was going to collect his commission. He testified that after Bell had made these sharp statements to him that he stated, in substance that "he was not going to let Strauch buy the house and that Strauch was going to build a house and that he was going to pull him completely out of it." Bloomfield insists that he then said, "Mr. Bell, as far as I am concerned, our dealings are finished. I do not want you to call me anymore. I wouldn't have any dealing with you if you brought me $90,000 for the house. I would prefer not to deal with anybody that does not keep their word," and Mrs. Bell got on the phone and said, "I am an honest Christian woman and I go to church and I will have what is due me and I will drag you to the court, etc.," and I said, "If you do these things, that is not what is done on the Board and I am acquainted with members of the Board and you are entitled to one commission if you consummate your deal, and if you don't you are not entitled to anything, and as far as I am concerned I am not going to have anything to do with you or with any member of your organization." (R. 158.)

Mr. Bloomfield stated that they called him on Sunday night and told him that they understood Mr. Strauch had been out with someone else to see the house and he bought it, and he told him that the deal had not been closed. He does not remember having any conversations with them after that.

Mr. Bloomfield admitted that he called Mrs. Hall and inquired of her in effect whether a non-member of the Real Estate Board brought in a trade he could get a commission for his trade, and Mrs. Hall told him that such agent could get a commission on their part of the exchange or the property they had brought into the deal, but he insisted that he had that conversation with Mrs. Hall because of the fact that he, Bloomfield, had a cousin who had recently gone into the real estate business and was not a member of the Board. He does not remember asking Mrs. Hall about the Bells.

The Chancellor, in his opinion referring to the issues between the complainants and Bloomfield, further said:

"At the outset, the first and vital issue between the complainant, Mrs. Bell, and the defendant, Bloomfield, is the testimony of Mrs. Bell as to the sole agency which Mr. Bloomfield had with Norman Eisenberg. She says that Mr. Bloomfield said "Well, never mind that; if you make a sale of this property, I will pay you a commission and I will take care of Norman Eisenberg,' which from the testimony the Court concludes meant to Mrs. Bell that he would make a satisfactory arrangement with Mr. Eisenberg to cancel the commission, or in the last analysis, would pay him as well as Mrs. Bell, and that is the inference and the conclusions which the Court finds as a fact is what occurred in this lawsuit."

In commenting on the testimony of Mrs. Bloomfield the Chancellor said:

"As to Mrs. Bloomfield, the impression which this Court got from her testimony is that probably either she had read or somebody had told her, which is

always a safe refuge on the witness stand, to say 'I don't remember.' Nobody can make the witness remember. Well, that may be a perfectly safe outlet for a witness, so far as not being compelled to actually testify what the witness does actually remember and says she doesn't, but it is no protection against the witness resorting to that subterfuge being disbelieved by the Court that is hearing the evidence, and that is exactly what has occurred in this case as far as Mrs. Bloomfield is concerned."

In speaking of the witness, defendant Jane H. Strauch, the court said:

"As to Mrs. Strauch, the Court thinks that to the best of her ability she testified as truthfully as she remembered the transaction, but her testimony threw very little light on the subject, and none that conflicted with the ultimate outcome of the lawsuit."

This Court not being able to see the witnesses, but having only the record before it, has not the opportunity to pass upon the manner and the demeanor of the witnesses on the stand and to form any opinion of the weight of this testimony from these angles. At this point, in this opinion, it is observed that a careful reading of this record, which has most certainly been done, reveals the fact that the learned Chancellor was exactly correct with respect to the testimony of Mrs. Strauch. Factually there is no corroboration by her of any statement of any of the witnesses who testified for defendants nor the other defendants themselves. She does verify the testimony of the Bells at some points, but taking her entire testimony, the Chancellor was correct in saying that it "threw very little light on the subject, none that conflicted with the ultimate outcome of the lawsuit."

In regard to the statement made by the learned Chancellor with respect to the testimony of the defendant, Mrs. Bloomfield, and the impression which she made on the Court as a witness, we do not comment, but the record of her testimony is replete with the answer to the effect that she doesn't remember what occurred, and this places her in the same category as Mrs. Strauch insofar as her testimony is of any probative value, and particularly such as tends to corroborate any vital statement upon the issues by any other defendant.

Thus, as to the testimony of the parties themselves, in a review of this record, this Court is faced with the testimony more or less of Bells on the one hand, and with the testimony of Bloomfield, on the other hand as regards the issues in the second case. It is likewise faced with the testimony of the Bells on the one hand, and the defendant Strauch on the other hand, as regards the issues in the first case.

Some of the assignments of errors by respective defendants are similar, and mean identically the same thing. The effect of assignment of error number I in each case is that the Chancellor erred in holding defendants in the respective cases legally obligated to complainants for the commission decreed in the respective cases. A correct solution of this assignment practically determines all others.

The effect of assignment of error number II, in each case is that the Chancellor erred in finding that the Strauchs, in the first case, and the Bloomfields in the second case "deliberately and intentionally and purposely undertook to short circuit or circumvent the complainant from getting a reasonable commission."

The third assignment of error in each case is similar and is to the effect that the Chancellor erred in finding as a fact that the defendants Bloomfield and defendants Strauch conspired together to short circuit or prevent complainants from collecting commissions on each of the transactions.

The fourth of the assignments of error in the first case and the sixth assignment of error in the second case are similar and leveled at the failure of the Chancellor to hold that the complainant, in each case, was guilty of bad faith, and that she came into Court with unclean hands.

The fifth assignment of error in the Strauch case and the seventh assignment of error in the Bloomfield case are virtually the same and charge the learned Chancellor with error in failing to hold that the complainant never did produce a contract acceptable to both parties.

The fourth assignment of error in the second (Bloomfield) case is to the effect that the learned Chancellor erred in finding that Harry Bloomfield agreed with complainant that he would make a satisfactory arrangement with Mr. Eisenberg to cancel the commission, or in the last analysis, if necessary would pay him as well as Mrs. Bell.

The fifth assignment of error in the second case is leveled at the finding of the learned Chancellor that Mrs. Bloomfield resorted to the subterfuge of saying, "I don't remember" and, therefore, the Court disbelieved her testimony.

At this point it would be well, in connection with these cases, if we properly analyze exactly what the question is to be determined between the respective parties. We

think that is a simple one and is the identical question, however not from the same state of facts, as was posed and determined in the case of Loventhal v. Noel, 196 Tenn. 308, 265 S. W. (2d) 891, 893, decided March 3, 1954 by the Supreme Court of Tennessee, reviewing an opinion of the Court of Appeals, which had reversed the Chancery Court of Davidson County in that case, when the Supreme Court said:

"We think the Court of Appeals was correct in holding: 'The question is not whether or not there was a valid contract of sale between the Stillmans and the defendants but whether or not the complainant is entitled to commission.' "

In the consolidated cases now being considered, in the first case the question is not whether there was a valid contract of sale between Strauch and Bloomfield, but whether or not the complainant is entitled to a commission from Strauch. So in the second case, the question is not whether or not there was a valid contract between Bloomfield and Strauch, but whether or not the complainant is entitled to a commission from Bloomfield.

If this Court is correct in stating the question posed in these consolidated cases, what we have already said, makes it unnecessary for us to determine whether Harry Bloomfield agreed with the complainant that he would satisfy Eisenberg, and we will not attempt to do so, for whether he did or did not so agree is but a circumstance in connection with the involved issues. Likewise it is not necessary for this Court to determine whether Mollie W. Bloomfield resorted to the subterfuge of saying "I don't remember," and the Court was justified in disbelieving her testimony, insofar as it is an issue in

these consolidated cases. The learned Chancellor saw her as she testified, and though it be unnecessary to the proper determination of the issues, there is nothing in the record which preponderates against the finding of the Chancellor with regard ot her testimony.

So viewing assignments of error number IV and number V in the second case we are able to consider the other assignments of error in each case together. Let us first consider assignments of error number V by Strauch and number VII by Bloomfield to the effect that the Chancellor failed to find that complainants never produced a contract acceptable to the defendants, in the respective cases.

■ If Mrs. Bell, as a real estate broker, and Mr. Bell, as a real estate agent, were representing both the Strauchs and Bloomfields, with authority from each, and had (1) made known to each of them the fact of their authority to negotiate a contract for the exchange of their respective properties, (2) had been given the terms by each of their principals upon which the exchange could be made effective by a binding contract, (3) were not given a reasonable time in which to consummate the respective offers into a binding contract, but (4) by the combined effort of Strauch and Bloomfield to obtain an exchange of the properties which would have either Strauch or Bloomfield, or both of them some amount of the commissions thereby preventing Mrs. Bell from closing the transaction, each would be bound to her for the reasonable commission charged for such service in the community.

■ A broker may represent both parties if his agency of each is made known to the other.

"A broker is, ordinarily, an agent in whom a special trust and confidence are reposed. His principal, unless he agrees to less, is entitled to the undivided benefit of the broker's skill, knowledge and experience. If his principal, with full knowledge of the facts, consents to the broker's also acting for the other party in the same transaction, there is no legal objection to such a course; but, except with such consent, the broker will not be permitted to assume a double agency, and if he does so the principal may avoid liability." Mechem on Agency, Second Ed. Vol. 2, Sec. 2398 (Law of Agency of Brokers).

Commenting upon the duties of an agent to his principal, and the relationship existing between them, the author further states:

"For similar reasons, as has been seen, the broker will not be permitted, without the full knowledge and consent to his principal, to represent the other party also in the same transaction. If he were commissioned to sell, his duty to the seller requires that he shall obtain as large a price as possible, while if he were commissioned to buy, his duty to the buyer would be to buy at as low a price as possible. To undertake to perform both duties at the same time, involves a manifest incongruity, and one or both of his principals must suffer from the attempt. If, however, each having full knowledge of his relations to the other, sees fit to trust him to bargain for him, there is no legal objection to such a course, and neither principal could complain." Sec. 2412, pages 1976-1977.

■ "An agent may with full knowledge of both principals represent two principals having adverse interests but it is not enough for agent to put principal upon inquiry and agent must disclose such material facts as are unknown to principal and as will enable principal to form a reasonably correct opinion and conclusion as to principal's best interest." McNeill v. Dobson-Bainbridge Realty Co., 184 Tenn. 99, 195 S. W. (2d) 626, 629; Siler v. Perkins, 126 Tenn. 380, 391, 149 S. W. 1060, 47 L. R. A., N. S., 232; American Law Institute Restatement of the Law of Agency, Vol. 2, Sec. 394, Subsection (b), p. 891.

The same principle will apply when the broker represents each of the principals, and that fact be known to each of them, with respect to the right of the broker to his commission, as if he had only been the agent of one principal, if he acts with consideration for the interest of each.

"After a broker has found a customer and commenced negotiations, neither principal nor customer can back down off and defeat the broker's right to compensation by concluding the transaction without his aid. Nor can a principal reject an offer made by a person found by a broker and then without the broker's intervention sell to the same person and thus defeat the broker's right to a commission. A broker is entitled to a commission for effecting a sale although he takes no part in the negotiations, where the sale is effected as the result of his introducing the customer and the principal or his putting them into communication; the principal cannot defeat the right to compensation by closing the transaction directly with the customer without the broker's further aid." Arrington & Farrar v. Cary, 64 Tenn. 609; Royster

v. Mageveney, 77 Tenn. 148; Glascock v. Vanfleet, 100 Tenn. 603, 46 S. W. 449; Goar v. Laribe, 27 Tenn. App. 618, 624, 183 S. W. (2d) 774; 9 C. J. Sec. 99, p. 619, 12 C. J. S., Brokers, sec. 66, p. 154.

■ Neither will a broker be defeated of his commissions by the principal entering into some contract or arrangement with another broker, and completes the transaction through him.

"A seller should not be allowed to escape liability to the broker for his reasonable compensation by entering into a contract with another [agent] when the seller has knowledge of the broker's action and promises him she will accept the fruits of his labors." Chambers v. Percefull, 28 Tenn. App. 517, 191 S. W. (2d) 568, 569, 12 C. J. S., Brokers, sec. 66, p. 154.

When the principal, acting in bad faith toward the broker, revokes the agency and closes the deal with the person or persons negotiated with by the broker, the broker is entitled to recover his commission. Pyles v. Cole, 34 Tenn. App. 601, 241 S. W. (2d) 841; Nance v. Smyth, 118 Tenn. 349, 99 S. W. 698; 12 C. J. S., Brokers, sec. 66, p. 154.

It is insisted by the defendants in each case that the complainant acted in bad faith, particulary toward the defendant in the first case, when she submitted a contract to them showing that they were to pay the commissions on each piece of property. This contention is based upon the fact that the complainant admits that Bloomfield had said to her and to her husband that he wanted them to try and get Strauch to pay both commissions, and in

which event they, the Bloomfields, would make the additions or completions suggested by the Strauchs, notwithstanding the fact that the complainant also said, and in which statement she is supported by her husband, that Bloomfield agreed to pay the commission on the piece of property owned by him if Strauch refused to pay both commissions, insisting that it was the duty of the complainant to lay bare the whole offer of the exchange of property made by the principals through her.

If we find that such a proposition or agreement was made by Bloomfield, with instructions to be submitted to the Strauchs on the basis of both commissions being paid by the Strauchs, without also revealing to the Strauchs, that the Bloomfields were willing to pay a commission on their property if the transaction could not be closed that way, and the complainant submitted the proposition based upon the suggestion of Bloomfield, we can see no bad faith in submitting the agreement in that manner, respecting the Strauchs. Also, if we find, as the Chancellor did, that when the proposition was submitted to the Strauchs as suggested by the Bloomfields, and the Strauchs complained about paying all the commissions, whereupon the Bells insisted upon re-submitting the matter to Bloomfield upon the proposition of reducing the value on the Bloomfield property so as to be the same in dollars to Strauch as having to pay only the commission on his property, and Strauch refused to let the Bells make such effort, for the reason that he felt that the Bloomfields would not agree to it, and with the situation in that condition, he contacted agent Avery and closed the transaction upon the same basis, and at the same cost to him, had he permitted the Bells to complete the transaction, we can see no bad faith under such

circumstances, on the part of complainants toward the Bloomfields.

"The rule is well settled that a broker cannot earn a commission while representing an adverse interest. There is a well recognized exception, however, that commissions may be due if the employer had full knowledge that the broker was also representing the other party to the transaction." Brown v. Beeson, 31 Tenn. App. 602, 218 S. W. (2d) 997, 1000; Siler v. Perkins, 126 Tenn. 380, 149 S. W. 1060, 47 L. R. A., N. S., 232; McNeill v. Dobson-Bainbridge Realty Co., supra; 8 Am. Jur. sec. 87, C. J. S., Brokers, sec. 43, p. 105.

It is insisted by learned counsel for Strauch that their contention is supported by the opinion in the case of McNeill v. Dobson-Bainbridge Realty Co., supra, within which it is said:

"However, it is not enough for the agent to put the principal upon inquiry, but must disclose such material facts as are unknown to the principal and as will enable him to form a reasonably correct opinion and conclusion as to his best interest' ''. Citing Roht v. Union Consol. Mining Co., 73 Tenn. 1, 21, 22.

We recognize that to be the rule, but we think that in these cases now being considered the broker had disclosed to each party, "such material facts", as was necessary for him to disclose, and not only so, but that the agent showed a willingness to try and get done the very thing, that Strauch insisted upon, insofar as actual cost in dollars and cents to him was concerned, which he refused to let them do.

The facts of this case clearly reveal that Avery was called into this transaction by Strauch, who appeared with him at the Bloomfields' home, after he, Avery, had called Bloomfield, told him he was a real estate agent and wanted to see him. When Avery appeared at the Bloomfields with Strauch, Bloomfield admits that he saw them in the same car, and that this was on Sunday after the Saturday night's conversations between the Bells, the Stranchs and Bloomfields. The record also reveals the fact that Avery made, not only one trip to the Bloomfield home, but two on the same afternoon or night, in addition to his telephone call, but all after he had been called into this transaction by Strauch, and that the contract was signed the following day upon practically the identical terms which the Bells had testified had been agreed upon with them, and as shown by the respective exhibits of the proposed and final contracts.

We think the learned Chancellor was exactly correct when he said that this was not a case in which different agents had raced to close a transaction which they each had actual authority to close, and that the first was entitled to compensation.

The hardship or burden of paying double commissions was brought about by the joint action of Strauch and Bloomfield. Bloomfield had voluntarily listed his property with the Eisenberg firm,—Mrs. Hall agent, under an exclusive arrangement. The Strauchs had called Mrs. Bell and brought her into the transaction for them. She had brought the Strauchs and Bloomfields together, carried on communication for several days, virtually reaching the point where the transaction could be closed, and we think the record clearly shows that an effort was being made both by Strauch and Bloomfield to

defeat payment, of a reasonable commission or commissions for the work performed by the Bells in behalf of each of them. All agreements consummated by Mr. Bell, the agent, with Bloomfield and Strauch, or either of them, were no more nor less than an affirmance of the contract with Mrs. Bell, the broker.

■ Mr. Askew, the state official having the title of Commissioner of Real Estate for West Tennessee, stated that the real estate agents' commission was 5% up to $25,000 and 3% above that amount in the city of Memphis, and 5% straight outside of the city of Memphis. He also stated that it was a practice in the payment of commission on exchanges of houses that the commission be paid by each side for the full value of the house or on an established value. He also testified that it was unusual for one party in such transaction to pay both commissions. On cross-examination he testified that the rates were agreed upon by the Memphis Real Estate Board, and constituted the customary and usual rate as above set out.

Thus it will be seen that the judgment of the learned Chancellor in favor of the complainant in each case is no more than the customary commissions due the real estate broker in the community where the transaction has occurred.

This Court, without going further can adopt the position that the evidence not preponderating against the decrees of the Chancellor, his decrees would have to be affirmed, which position is very applicable to the cases involved in this record. In justification of the complainants, however, and the action of the Chancellor, it is our opinion, that the proof in these cases clearly preponderates in favor of the decrees.

Thus we answer the question, heretofore set out in this opinion, in the affirmative to the effect that the complainants are entitled to recover of the respective defendants for their services as shown by the decree of the Chancellor. All assignments of error by the appellants in each case are overruled, the decree affirmed, with interest, and the cost of this appeal will be taxed jointly and equally to the appellants, the Strauchs and Bloomfields. Decree will be entered in accord with this opinion in the amount of the original judgments plus interest thereon from January 15, 1954.

Carney and Hickerson, JJ., concur.