[No. 46726. En Banc. July 22, 1982.]

JOHN COGAN, *as Personal Representative, Respondent,*
v. KIDDER, MATHEWS & SEGNER, INC.,
ET AL, *Petitioners.*

*Pinckney M. Rohrback* (of *Keller, Rohrback, Waldo & Hiscock*) and *Richard W. Pierson,* for petitioners.

*Scott W. Wyatt,* for respondent.

UTTER, J.—John Cogan, executor of the estate of Joseph C. Banchero, alleges defendant/petitioner Kidder, Mathews & Segner, Inc. (Kidder, Mathews) breached its fiduciary duty to him in failing to disclose numerous material facts. We hold Kidder, Mathews violated its fiduciary duty by

failing to disclose its dual agency relationship.

On April 6, 1976, John Cogan agreed to list for sale a 10–acre parcel of real estate located in Tukwila, Washington, with Kidder, Mathews, an industrial real estate brokerage firm. Two brokers from the firm, Russell Segner and Jerome Mathews, showed the property to prospective purchasers, including Paul Ginn. In June 1976, Ginn signed and submitted an earnest money agreement on the property for $280,000 cash. The named offeror of the agreement was "Paul Ginn and/or assigns". Cogan also signed the agreement, but first modified it by inserting language which provided the commission of $19,000 to Kidder, Mathews would be payable only if and when the sale closed. The closing was subject to several conditions including the condition that the purchaser be able to obtain necessary permits and easements, and that closing occur within 120 days of court approval.

On September 24, 1976, Ginn told Kidder, Mathews that he would be willing to sell his interest in the property if he could obtain a $20,000 profit, net of commissions. Kidder, Mathews then undertook the role of Ginn's agent and offered the Tukwila property to Allied Body Works, Inc. for $320,000, $40,000 over the original sale price. Allied accepted on November 8. 1976. Since March 1976, Mathews of Kidder, Mathews had acted as an exclusive purchasing agent for Allied and had shown Allied the Banchero property prior to its purchase by Ginn. Allied had rejected the property at that time.

Allied wrote Cogan in December 1976 informing him it was the assignee of Ginn's interest in the earnest money agreement and that the conditions of the earnest money agreement were now deemed satisfied. Allied's letter disclosed its purchase price was $40,000 over Ginn's original purchase price. On January 10, 1977, 12 days before the closing deadline of the earnest money agreement between Cogan and Allied, Kidder, Mathews called Cogan requesting a 30–day extension of the closing deadline. Cogan was told the request was related to Allied's financing of the

purchase. The additional time was actually needed to effect an additional assignment to accommodate the desires of the owners of Allied who wished to arrange financing to purchase the Tukwila property as individuals rather than through the corporate entity. Kidder, Mathews not only failed to fully disclose the reasons for the extension, it also failed to inform Cogan that Ginn had agreed to pay Kidder, Mathews a $20,000 commission for its work and that the realtors were the exclusive purchasing agents for Allied. Cogan agreed to the extension, and, as a result of the delay in closing the Banchero estate, incurred an additional $660 in interest obligations on unpaid succession taxes.

When Cogan discovered that Kidder, Mathews was the agent of Allied and that it received a commission of $20,000 from Ginn for the assignment of the earnest money agreement, he instructed the closing officer to withhold payment of the $19,000 commission held in escrow, the $20,000 "secret commission", the $660 in additional interest obligations, and the $5,000 earnest money deposit.

The trial court found the agency relationship between Cogan and Kidder, Mathews revived when the stockholders of Allied requested an extension of the closing date. It found Kidder, Mathews had no duty to disclose to Cogan its commission from Ginn and its agency relationship with Allied. The trial court limited damages to $660 in additional interest obligations incurred by the estate as a result of the 30–day extension of the closing date with Allied.

The Court of Appeals reversed all but the trial court's award of $660 to Cogan. It held Kidder, Mathews had breached its fiduciary duty to Cogan by failing to disclose certain material facts, including Kidder, Mathews' representation of Ginn in the subsequent sale of the land, its receipt of a $20,000 commission from Ginn, its position as exclusive purchasing agent for Allied and its failure to fully apprise Cogan of the reasons for Allied's request for a 30–day extension of the closing.

The Court of Appeals directed the trial court to enter judgment against Kidder, Mathews forfeiting not only the

$660, but also its $19,000 commission from Cogan and its $20,000 commission from Ginn. *Cogan v. Kidder, Mathews & Segner, Inc.,* 24 Wn. App. 232, 600 P.2d 655 (1979).

On review, we agree in part with the Court of Appeals and modify its order accordingly.

I

In *Mersky v. Multiple Listing Bur. of Olympia, Inc.,* 73 Wn.2d 225, 437 P.2d 897 (1968), we held a real estate agent breached her fiduciary duties by failing to disclose to her principal that the purchaser of the principal's property was the realtor's sister. In *Mersky,* at page 229, we set out the duties a realtor owes his or her principal:

> [T]here flows from this agency relationship and its accompanying obligation of utmost fidelity and good faith, the legal, ethical, and moral responsibility on the part of the listing broker, as well as his subagents, to exercise reasonable care, skill, and judgment in securing for the principal the best bargain possible; to scrupulously avoid representing any interest antagonistic to that of the principal in transactions involving the principal's listed property, or otherwise self–dealing with that property, without the explicit and fully informed consent of the principal; and to make, in all instances, a full, fair, and timely disclosure to the principal of all facts within the knowledge or coming to the attention of the broker or his subagents which are, or may be, material in connection with the matter for which the broker is employed, and which might affect the principal's rights and interests or influence his actions.

(Citations omitted.) Where an agent has dual responsibilities or is serving an interest adverse to the principal, disclosure of such a conflict is always required. Thus,

> It is of no consequence, in this regard, that the broker may be able to show that the breach of his duty of full disclosure and undivided loyalty did not involve intentional or deliberate fraud, or did not result in injury to the principal, or did not materially affect the principal's ultimate decision in the transaction.

*Mersky,* at 231.

The policy underlying this duty of disclosure is obvious;

it is both to insure the undivided loyalty of the agent and "to assure the principal that he may have and rely upon the impartial and unreserved fidelity of his agent throughout the course of the transaction for which the agent was employed." *Mersky,* at 230.

The Restatement (Second) of Agency § 381 (1958) imposes the same duty of disclosure. An agent has the general duty to use "reasonable efforts to give his principal information which is relevant to affairs entrusted to him", which "the principal would desire to have". Comment *d* to section 381 states if an "agent has, or if he represents another who has, interests adverse to the principal as to matters within the scope of the agency . . . he is under a duty to the principal to reveal such facts in accordance with the rules stated in Sections 389–392." Section 391 states:

> Unless otherwise agreed, an agent is subject to a duty to his principal not to act on behalf of an adverse party in a transaction connected with his agency without the principal's knowledge.

The disclosure rule of *Mersky* and section 391 reflects a prophylactic concern for maintaining unmitigated loyalty in the principal–agent relationship. It guards against the possibility of compromising an agent's absolute duty to his principal. *See* Restatement (Second) of Agency § 387 (1958). As Justice Brandeis once wrote: "Sunlight is said to be the best of disinfectants, electric light the most efficient policeman." L. Brandeis, *Other People's Money,* ch. 15 (1914).

■ Such a duty of disclosure existed in this case. Kidder, Mathews argues its agency relationship with Cogan ended with the signing of the earnest money agreement, and that Cogan was legally obligated to comply with the terms of the earnest money agreement. We agree with Kidder, Mathews that one of its primary responsibilities in its agency relationship was to find a purchaser of the Tukwila property. We disagree with Kidder, Mathews' contention the signing of the earnest money agreement ended its agency relationship. Cogan included language in the earnest

money agreement which conditioned Kidder, Mathews' commission on "if and when the sale closes." To the extent Kidder, Mathews continued to work toward closing, it continued as agent of Cogan. The trial court and the Court of Appeals found the principal–agent relationship between Cogan and Kidder, Mathews existed at the time Kidder, Mathews asked Cogan for an extension of the closing date, and we concur in their findings.

What then, was Kidder, Mathews obliged to disclose to Cogan at the time it made the request for the extension? Since the offeror of the earnest money agreement was "Paul Ginn and/or assigns", Ginn was certainly within his rights assigning his interest to Allied for $40,000. Since Cogan would have been legally obligated to comply with the terms of the assignment if the conditions of the earnest money agreement were met, Kidder, Mathews did not violate any fiduciary duties to Cogan by serving as Ginn's agent with respect to that transaction. Nor do we feel its commission from Ginn with respect to that transaction was a factor that should have been disclosed as part of its agency responsibilities to Cogan. Cogan acknowledged his legal obligation to comply with the assignment under the earnest money agreement, and Kidder, Mathews' commission from Ginn was irrelevant to that legal obligation.[1]

■ Kidder, Mathews was not only Ginn's agent with respect to the assignment; it also served as the exclusive purchasing agent of Allied. When Kidder, Mathews requested the extension from Cogan, it made that request as the agent of Allied. It was not foreclosed from making the request, but it could do so only by making full disclosure to Cogan of its other responsibilities. *Brandt v. Koep-*

---

[1]We disagree with the Court of Appeals characterization of the earnest money agreement as an "option to purchase". If the conditions of the agreement had been met, Cogan would have been legally obligated to close under it. Furthermore, there is no evidence Kidder, Mathews failed in its agency responsibilities to Cogan by neglecting to obtain Allied as the initial offeror at the higher price and seeking to obtain two commissions with respect to the sale of the Tukwila property at the expense of Cogan.

*nick,* 2 Wn. App., 671, 674, 469 P.2d 189 (1970). Cogan was justified in assuming the request was being made by his agent who was acting in his best interests with undivided loyalty. Cogan's $19,000 commission to Kidder, Mathews represented his interest in Kidder, Mathews' unmitigated loyalty.

Here, the rule of disclosure has not only preventive justification, but also addresses the problems that may arise when an agent acts with less than unequivocal loyalty to its principal, as exhibited by Kidder, Mathews.

Acting on behalf of Allied, Kidder, Mathews asked Cogan to extend the closing date and offered only a general explanation of the reasons for the extension. This extension was beneficial to Allied and was detrimental to Cogan in that the estate suffered additional interest obligations of $660, and more importantly, lost the opportunity to exact additional consideration for granting the extension.

While Cogan could have refused the extension unless he received additional consideration, he did not. If he had been told of Kidder, Mathews' conflicting relationships his response might well have been different. While Cogan had a good faith obligation to proceed to completion of the earnest money agreement, *Weaver v. Fairbanks,* 10 Wn. App. 688, 519 P.2d 1403 (1974), that duty did not obviate Kidder, Mathews' duty to inform its principal of all the options available to him in pursuit of his own interests.

Since Cogan justifiably expected that Kidder, Mathews was serving as his agent, its request for the extension was not a neutral act. By making the request without qualification, Kidder, Mathews encouraged Cogan to accept it. In effect, it represented acceptance of the request as in Cogan's best interests, and it is of little surprise that he complied.

The possibility that Cogan could have refused the extension yet still have been legally obligated to close the sale if Allied chose to comply with the existing closing date does not dispose of Kidder, Mathews' duty to disclose its conflicting interests to Cogan.

Under the legal standards set forth above, Kidder, Mathews should have revealed its dual agency regardless of any loss incurred or gain foregone by such nondisclosure. While such losses and gains are often the products of fiduciary nondisclosure, they do not define the scope of the fiduciary's duty. We do not mean to prohibit agents from dealing with several principals in related transactions. Nor is a dual agency per se unlawful. *Brandt v. Koepnick, supra*. All we require is the full disclosure of these various relationships. *See Investment Exch. Realty, Inc. v. Hillcrest Bowl, Inc.*, 82 Wn.2d 714, 513 P.2d 282 (1973).

The trial court did make conclusions of law that when Allied requested Kidder, Mathews to ask for an extension, Kidder, Mathews' agency relationship with Cogan "revived" (conclusion of law 6), and that when Kidder, Mathews made the request it had a "duty to disclose material facts concerning that request for extension of time" (conclusion of law 7). The trial court erred, however, in failing to find Kidder, Mathews had a fiduciary duty to disclose its dual agency. Plaintiff's proposed conclusions of law 7, 8. Assignment of error 5.

In conclusion, we agree with the trial court that Kidder, Mathews violated its fiduciary duty by failing to fully disclose the reasons for Allied's requested extension, but it erred in declining to hold that such fiduciary duty was violated by Kidder, Mathews' failure to disclose its dual agency role.

## II

The question of the appropriate measure of damages for such breach remains. Not only does harm not define the scope of fiduciary duty, it also is not determinative of damages. The trial court's conclusion of law 8 was that Cogan was "damaged in the sum of $660 which is the additional interest penalty incurred during the extension period", and that he "should recover such damage." The Court of Appeals held that Kidder, Mathews must pay to Cogan its $20,000 commission from Ginn as well as forfeiting its

$19,000 commission from Cogan. We hold Cogan is entitled to the $660 award and should recover his commission to Kidder, Mathews of $19,000.

■ There is little difficulty in sustaining the trial court's award of $660. An agent is subject to any losses incurred from his breach of duty. *Meerdink v. Krieger,* 15 Wn. App. 540, 545, 550 P.2d 42 (1976); *Koller v. Belote,* 12 Wn. App. 194, 528 P.2d 1000 (1974); Restatement (Second) of Agency § 401 (1958).

■ Because Kidder, Mathews violated its fiduciary duty to Cogan by failing to disclose its dual agency role, it should also forfeit its commission of $19,000.

The Restatement (Second) of Agency § 469 (1958) provides: "An agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty". In *Williams v. Queen Fisheries, Inc.,* 2 Wn. App. 691, 469 P.2d 583 (1970), the Court of Appeals interpreted section 469 as flexible and held the denial of compensation "generally rests with the discretion of the court". *Williams,* at 698. We adopt this interpretation.

Kidder, Mathews, while having obtained Ginn as a purchaser of the Tukwila property, had no right to the $19,000 commission until the sale closed. *See Ralph Hochman & Co. v. Fort Stanwix Mfg. Co.,* 284 F. Supp. 995 (N.D.N.Y. 1967); *Donaldson v. LeNore,* 112 Ariz. 199, 540 P.2d 671 (1975); *Casey v. Jones,* 275 Md. 203, 339 A.2d 33 (1975); *Graves v. Pelican Downs, Inc.,* 292 So. 2d 297 (La. Ct. App. 1974); *Wahl v. Hutto,* 249 S.C. 500, 155 S.E.2d 1 (1967).

By failing to disclose its dual agency before its agency responsibilities to Cogan were complete, Kidder, Mathews lost a right to compensation as Cogan's agent. Our cases hold failure to disclose a dual agency warrants forfeiture of the commission. *See Investment Exch. Realty, Inc. v. Hillcrest Bowl, Inc., supra; Ramsey v. Sedlar,* 75 Wn.2d 901, 454 P.2d 416 (1969); *Meerdink v. Krieger, supra; Koller v. Belote, supra. See also Ross v. Perelli,* 13 Wn. App. 944, 538 P.2d 834 (1975). Other jurisdictions concur in requiring forfeiture of a commission for failure to disclose a dual

agency. *See, e.g., Anderson v. Anderson,* 293 Minn. 209, 197 N.W.2d 720 (1972); *Allied Sec., Inc. v. Clocker,* 185 Neb. 524, 176 N.W.2d 914 (1970).

While the rule might seem harsh, strong public policy reasons justify it. If damages were measured solely by the loss to the principal often there would be little disincentive to the agent for assuming conflicting responsibilities without disclosure. If the commission itself is subject to forfeiture, however, agents will be disinclined to blithely assume conflicting responsibilities without disclosure to and consent of both principals.

Furthermore, the rule is designed to *prevent* agents from assuming conflicting responsibilities unless the principal consents upon full disclosure. A principal may never discover his agent's conflicting responsibilities; in this case, Cogan discovered Kidder, Mathews' breach of duty only accidentally. Agents must be given a structural disincentive to assuming dual agencies without disclosure and consent. That disincentive is the risk of forfeiting compensation.

A constructive trust in favor of Cogan will be imposed on the $19,000 commission which represented Cogan's interest in Kidder, Mathews' undivided loyalty. Kidder, Mathews may retain its $20,000 commission from Ginn.

We remand to the trial court for entry of judgment in accordance with this opinion.

ROSELLINI, STAFFORD, WILLIAMS, DIMMICK, and PEARSON, JJ., and CUNNINGHAM, J. Pro Tem., concur.

BRACHTENBACH, C.J. (dissenting)—Before examining the applicable law, it is necessary to review the facts, some of which are glossed over by the majority.

I

The plaintiff is John Cogan as personal representative of the Banchero estate. Cogan is an experienced lawyer, knowledgeable in real estate matters. He had been trying to sell the Banchero property for several years prior to the events which are the focus of this case; he had contacted

many brokers and had advertised the sale, but his efforts had not produced a single offer at any price.

Several factors made this property difficult to sell. The market was "distressed." Moreover, the property was a vacant lot, bisected by a creek, within a flood plain, and within a Shorelines Management area. Thus, there were a number of potential development problems. Finally, the estate's unequivocal demand for a cash sale was an additional burden.

When Cogan contacted defendant broker, he set the price at $280,000 and required "a quick cash pay–off." He never inquired of defendant broker's opinion regarding the value of the property or terms. Nor did he list the property with defendant broker in the contractual sense. He simply wrote to six brokers, including defendant, informing them of the property and its sale price. Thus, this situation is factually different from most broker cases wherein the duty of the broker includes the "exercise [of] reasonable care, skill, and judgment in securing for the principal the best bargain possible". *Mersky v. Multiple Listing Bur. of Olympia, Inc.*, 73 Wn.2d 225, 229, 437 P.2d 897 (1968).

The offer from Paul Ginn through defendant broker was the sole offer received by Cogan. The Ginn earnest money agreement was for the exact price asked by the estate, $280,000, payable in cash at closing. According to Cogan, the conditions included in the agreement were those customarily included in offers to purchase commercial real estate and were such as could generally be satisfied by good faith efforts on the part of the purchaser.

The earnest money agreement named the offeror as "Paul Ginn and/or assigns." Mr. Cogan acknowledged that the use of "and/or assigns" is frequently used with commercial earnest money offers. He stated he was not concerned with the possibility of the sale of Paul Ginn's interest before closing, since it was a cash sale. Upon signing the agreement, the estate was legally bound to convey the property to Ginn and/or his assigns. The sale was to be closed within 120 days after court approval.

Subsequently, almost 3 months later, Allied's interest in the property was renewed because of problems with other alternatives they had been pursuing. Allied had been offered the property before, so they knew what Ginn had paid for it and they knew he had a legal right to assign his earnest money right.

At this point, the relationships, rights and liabilities of the parties are beyond challenge. The estate had sold at its asking price and terms, cash. It had agreed that Ginn could assign the earnest money right to purchase. Ginn did so. The estate knew it was legally bound to convey to Ginn's assignee. Cogan himself acknowledged that it was immaterial who the assignee was because the purchaser had to pay cash. No advantage was sought or taken by the broker or Allied. The broker had violated no duty or obligation to the estate.

The only event upon which the majority relies is a 30–day extension for closing made by Allied and relayed to the estate by defendant broker. There was no great mystery, conspiracy or duplicity about this request; the three shareholders of Allied merely decided to purchase in their individual names for tax and financial planning reasons, and to accomplish this they needed additional time to arrange personal financing. The trial court specifically found that the corporate assignee, Allied, could have completed the transaction by the original closing date. Thus, no covert advantage to Allied or harm to the estate was sought or achieved.

When the estate inquired as to the reason for the request, the broker's employee said he did not know the specifics, but it had something to do with financing. Both statements were true—the employee, who had been employed by broker after the estate–Ginn deal was signed, knew nothing more and the request did have something to do with financing. Cogan made no further inquiry.

It must be emphasized that at this time Cogan was fully aware that Ginn had assigned his rights to Allied. Allied had not only notified the estate of the assignment, but had

also sent a copy of the assignment document which disclosed every term of the Ginn–Allied agreement, including the payment of the additional $40,000. Mr. Cogan had replied by letter, stating "I am pleased to hear that you will be buying the property."

Thus, at the time of the extension request, Cogan knew that Allied was the purchaser and that some aspect of their financing was the reason for the extension request. He also knew what his options were: he could have (1) declined to grant the extension as he had a binding contract with a specified closing date, (2) exacted consideration for granting the extension, or (3) requested more information. Although an attorney experienced in real estate transactions, he did none of these things. He asked no further questions. He made no contact with Allied. He made no requests or demands for consideration. He simply granted the extension.

To summarize, the facts reveal that the estate received everything it asked for. It sold its property for the price it asked, in cash. It could have closed on the specified date, but granted an extension without requesting, or even inquiring about, consideration for the extension. Nonetheless, the trial court awarded the estate $660 to cover the expenses incurred from the extension, and with this award, I have no quarrel.

The estate wants more, however. It wants, in essence, the benefit of a bargain that, from hindsight, might have been. Cogan argues that he had the right to know the defendant broker was receiving a commission for selling Ginn's right to assign. As this commission had no legal effect on the rights and duties between the estate and the purchaser (Ginn or Allied), one can only hypothesize that Cogan wanted the opportunity to renegotiate the broker's commission from the initial sale in light of the broker's subsequent, additional profit from the sale of Ginn's right. The estate was bound by its contract, however; whether it might have made a better deal in retrospect is truly irrelevant.

The majority opinion serves to rewrite a contract freely

entered into by a knowledgeable and sophisticated seller, ostensibly because of facts that are totally immaterial to the estate–broker relationship. I dissent.

## II

The trial court made a finding of fact that: "*It was not a material fact in reference to that request for extension that Paul Ginn had obligated himself to pay Kidder Mathews (broker) a commission on his sale.*" (Italics mine.) This fact is crucial to the outcome of the case. Nonetheless, no party assigned error to it. The majority, therefore, exceeds the proper scope of review when it concludes that this fact is material and should have been disclosed.

The scope of appellate review is limited. In *Washington State Bar Ass'n v. Great W. Union Fed. Sav. & Loan Ass'n,* 91 Wn.2d 48, 53, 586 P.2d 870 (1978) we stated:

> No error has been assigned to the findings of fact so they become the established facts of this case. Consequently *our review is limited to determining whether those facts support the trial court's conclusions of law and judgment.*

(Citations omitted. Italics mine.) The majority totally ignores this legal premise. Instead, it cites to the error assigned by plaintiff to the court's failure to make certain conclusions of law, specifically that a duty to disclose the dual agency existed. Majority, at 666. Such a conclusion does not stem from the uncontested findings of fact, however. Thus, the majority is clearly attempting to substitute its view of the facts for that of the trial court in order to reach the conclusion it desires. This it may not do. We stated emphatically in *Fay v. Allied Stores Corp.,* 43 Wn.2d 512, 519, 262 P.2d 189 (1953):

> It makes no difference that, as a matter of original determination, we might have decided otherwise had the issues of fact been submitted to us initially.

The materiality of a fact is to be decided by the trier of fact, the trial court or the jury.

*[T]he circumstances as to what facts are material and require full disclosure, where they do not involve self–interest, kinship, or strictly adverse interest . . . cannot be determined as a matter of law, but must be determined by the trier of facts after consideration of all the evidence.*

*Brandt v. Koepnick,* 2 Wn. App. 671, 675, 469 P.2d 189 (1970); *see also Saporta v. Barbagelata,* 220 Cal. App. 2d 463, 475, 33 Cal. Rptr. 661 (1963); *Adkins v. Lee,* 127 Ga. App. 261, 264, 193 S.E.2d 252 (1972); *Williams v. Burnside,* 207 Iowa 239, 242–43, 222 N.W. 413 (1928); *Sheffer v. Rudnick,* 291 Mass. 205, 210, 196 N.E. 864 (1935); *Guild v. More,* 32 N.D. 432, 442, 155 N.W. 44 (1915). Even though this court on the same facts might have reached a different conclusion, we are bound to accept the trial court's findings. Therefore, challenges to conclusions of law are without merit if the conclusions are supported by the unchallenged findings of fact. *Cf. Brandt v. Koepnick, supra.*

Applying the proper scope of review, it is clear that the trial court's conclusion, that no duty to disclose existed, is supported by its findings of fact, including the finding that disclosure of the broker's agency relationship with Allied was not material to the issue of the extension of the closing date. Therefore, the trial court's judgment should be affirmed.

The trial court found that nondisclosure of the commission from Ginn was not a material fact. Why? Because this particular seller, under these facts, was legally bound to sell to Ginn *or his assigns.*

A material fact is one to which a reasonable person might attach importance in choosing his course of action, . . . in other words, it is a fact that could reasonably be expected to influence the conduct of a person with respect to the transaction in question.

*Nader v. Allegheny Airlines, Inc.,* 445 F. Supp. 168, 174 (D.D.C. 1978), *rev'd on other grounds,* 626 F.2d 1031 (D.C. Cir. 1980). The nondisclosure was not and could not be material because it could not reasonably be expected to influence the conduct of the seller. It was a matter of fact,

an actuality, as determined by the trial court, that the seller had contracted to sell to Ginn or his assigns. It was a matter of fact, an actuality, that Ginn had assigned his contractual right of purchase to another. The seller had no choice but to honor the assignment. Therefore, the commission from that assignment is necessarily immaterial because it could not be reasonably expected to influence the seller's course of action. Whether or not Ginn was to pay a commission could not influence the seller's course of action since the seller had foreclosed any other course of action by agreeing to sell to Ginn or his assigns. One can hardly be influenced in his conduct or course of action when he has heretofore contractually obligated himself to perform a specific event, *i.e.*, convey to Ginn or his assigns.

The duty of a broker includes no more and no less than the duty to disclose *material facts*. Such is the Washington and universal rule. *Frisell v. Newman,* 71 Wn.2d 520, 526, 429 P.2d 864 (1967); *Patrick v. Cochise Hotels,* 76 Ariz. 136, 143, 259 P.2d 569 (1953); *Loughlin v. Idora Realty Co.,* 259 Cal. App. 2d 619, 629, 66 Cal. Rptr. 747 (1968); *Hardy v. Davis,* 223 Md. 229, 232, 164 A.2d 281 (1960); *Bell v. Strauch,* 40 Tenn. App. 384, 409, 292 S.W.2d 59 (1954); *Guisinger v. Hughes,* 363 S.W.2d 861, 866 (Tex. Civ. App. 1962); *Hopkins v. Wardley Corp.,* 611 P.2d 1204, 1206 (Utah 1980); Restatement (Second) of Agency § 392 (1958). As materiality defines the duty to disclose, the uncontested facts here do not permit this court to find such a duty as a matter of law.

The majority makes much of the fact that the broker did not explain its agency relationship to Allied when requesting the extension from Cogan. With reference to the extension, defendant broker was simply a conduit, passing on the request. The delay in closing did not benefit defendant broker. Nor would the refusal of the extension have harmed defendant, since Allied would have honored the closing date. The only hypothetical injury is the estate's lost opportunity to extract consideration for the extension. This was the result of Cogan's failure to pursue this option; it

was not related in any way to the broker's relation to the parties to the transaction.

The cases cited by the majority for the proposition that the commission should be forfeited are factually distinguishable. In each of those cases, the broker actively induced the seller to act in a way that benefited the purchaser. For example, in *Mersky v. Multiple Listing Bur. of Olympia, Inc.*, 73 Wn.2d 225, 437 P.2d 897 (1968), the buyer was a relative of the real estate agent, the offer was less than the listed price, and the agent persuaded the seller to accept the lower figure. The broker also misinformed the seller that he did not know the purchaser. In *Ramsey v. Sedlar*, 75 Wn.2d 901, 454 P.2d 416 (1969), the real estate agent changed the papers at closing to include a provision that was not part of the original agreement and was solely for the benefit of the purchasers. Moreover, the sellers were not informed that the real estate agent was also one of the purchasers. *Wesco Realty, Inc. v. Drewry*, 9 Wn. App. 734, 515 P.2d 513 (1973) similarly involved changes made in the terms of the agreement for the sole benefit of the buyer, without explanation to the sellers who were dependent on the real estate agent to understand the details of the transaction.

In contrast, here the broker did not mislead or misinform the seller. He did no more than inform Cogan, a sophisticated businessman, of the extension request. The request was not for the broker's benefit nor did he persuade Cogan to accept it. Moreover, Cogan was not harmed by the extension. Thus, this simply is not a situation that the principles of the fiduciary duties of an agent were designed to protect against. I dissent from the majority's opinion which serves only to save a sophisticated, knowledgeable seller from the consequences of his own failure to request consideration for a delay in closing.

DOLLIVER, J., concurs with BRACHTENBACH, C.J.

Reconsideration denied October 1, 1982.