# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| JOYCE LEATH BURTON, | ) ) | No. 68434-5-I |
| Respondent/Cross Appellant, | ) ) | DIVISION ONE |
| v. | ) ) | UNPUBLISHED OPINION |
| JANICE BECKER, aka JANNY BECKER, and the marital community of JANICE BECKER and JOHN DOE BECKER; and AFFILIATED MENTAL HEALTH PROGRAMS, INC., | ) ) ) ) ) ) ) | |
| Appellants/Cross Respondents. | ) ) | FILED: August 12, 2013 |

APPELWICK, J. — During the 60 day period between Burton's notice of termination and the effective date of her termination, Burton provided mental health treatment to former AMHP clients. AMHP withheld its severance payments based on Burton's breach of her duty of loyalty. The trial court determined that Burton breached her duty of loyalty, but nevertheless ordered AMHP to pay her salary, offset by payments she received from clients and unemployment benefits. AMHP argues that salary forfeiture is the exclusive remedy for an agent's breach of loyalty and that Burton tortiously interfered with its business expectancies. Burton argues that the actions leading to her breach of loyalty were justified by public policy considerations, that the trial court miscalculated her damages, and that she should have been able to obtain double damages and to pursue a claim against AMHP's president individually. The trial court improperly offset Burton's salary by the amount of unemployment benefits she received during her severance period. We otherwise affirm.

FACTS

Affiliated Mental Health Programs Inc. (AMHP) provides mental health counseling services to individuals with chronic and serious mental health issues. Joyce Burton worked for AMHP from 2004 to 2009. From January 2007 forward, she served as AMHP's director. As director, Burton was responsible for the company's financial performance and stability. She also maintained a counseling caseload.

When she accepted the director position, Burton signed an employment contract that explained the procedure for termination:

> AMHP may terminate this agreement with 60 days notice and with due cause and upon payment of compensation due to the Director for services rendered to the date of termination.

The agreement also included a noncompetition provision:

> The Director promises not to approach or solicit from AMHP clients on whose behalf Director has done any work pursuant to this contract for a period of three years from the date of the Director's completion of the work for the agency.

In July 2013, AMHP decided to terminate Burton on the basis of poor financial performance, and a poor management style. It contended that she was insensitive to staff members and communicated in a disrespectful manner. AMHP's owner and president, Janice Becker, gave Burton notice of termination on July 13. In a termination letter, she informed Burton that she would receive 60 days of pay and that she should not work during those final days of her employment:

> You will be paid as provided in the Agreement through your termination date [September 11, 2009]. However, you will not be required to render any services to AMHP during these final 60 days of your employment, other than answering brief phone calls if we have questions about matters you have handled or become familiar with during your employment here.

Becker also told Burton not to contact her existing clients. Nevertheless, Burton had contact with at least three clients after she was given notice of termination, beginning within one to two weeks of the termination letter.

On July 21, Becker warned Burton to stop talking to clients:

> I am even more disturbed to learn that you have improperly been contacting AMHP clients. Since we are not asking you to perform work duties at this point, there is no valid reason for you to be contacting any AMHP clients. You are no longer authorized to act on behalf of AMHP or to suggest to anyone that you are doing so. But until your termination date, you still have a duty of loyalty to AMHP, and it is unlawful for you to divert clients away from the agency. You have also promised, in Paragraph 10 of your Agreement for Professional Services, **"not to approach or solicit from AMHP clients on whose behalf Director has done any work pursuant to this contract for a period of three years from the date of the Director's completion of the work for the agency."** By contacting and approaching AMHP clients, you are breaching your contract with AMHP.
>
> You must immediately stop contacting AMHP clients. If you continue to do so, AMHP will take legal action against you, and will seek all remedies available to the agency under the contract and the law, including payment of money damages based on any reduction in the agency's case load resulting from your improper contacts with agency clients. In addition, if you continue to approach agency clients, then you will be in material breach of your contract, AMHP will no longer be obligated to continue paying your salary and benefits through the termination date, and AMHP will stop making those payments.

On July 24, AMHP's lawyer sent a letter to Burton's lawyer:

> AMHP's position in this matter is straightforward. As an employee of AMHP, Ms. Burton continues to have a duty of loyalty to the agency through at least her termination date in September. In addition, the Agreement for Professional Services she signed broadly states that she cannot "approach or solicit" AMHP clients for a period of three years. Nevertheless, since the day AMHP notified her of its intent to terminate her employment, she has improperly contacted AMHP clients, including Redacted who has now told AMHP that she will be seeing Ms. Burton rather than AMHP. Please understand that AMHP is very serious about taking legal action against Ms. Burton, as well as discontinuing payment of her salary, if she continues to violate her legal obligations.

AMHP sent Burton another letter on August 11, informing her that she forfeited any right to further salary or benefits:

> In spite of my warning to you in [the July 21] letter, you have continued to see AMHP clients on your own, and are diverting payments from those clients to yourself for your own financial gain. . . . This is a breach of your duty of loyalty to AMHP, as well as a breach of your Agreement for Professional Services.
>
> Because of these breaches, you have forfeited any right under that agreement to payment of additional salary and benefits. You cannot take AMHP's clients and pocket the proceeds, and still expect to continue receiving a salary from AMHP.

AMHP sent checks for Burton's salary through July 13, plus a payout of accrued but unused vacation. It informed her that it had paid for health and dental benefits through July 31, and gave instructions for Burton to begin paying for her own benefits.

Burton contended she did some counseling for free during the 60 day period, but also acknowledged she received and kept $1,125 from clients during that stretch. She directed the clients to send payment directly to her instead of to AMHP. While counseling the clients, she did not instruct them to formally terminate their relationship with AMHP, even though she knew the clients had signed an agreement with AMHP that required them to do so.

Burton sued AMHP and Becker personally, alleging that AMHP fired her without due cause, that AMHP breached its duties to her by discontinuing her salary and benefits, and that AMHP improperly used Burton's image on its website. AMHP denied liability and counterclaimed for breach of the employment contract's noncompetition provision, breach of the duty of loyalty, and tortious interference with a contractual or business relationship. Before trial began, AMHP withdrew its claim for breach of the

noncompetition provision. During trial, the court dismissed Burton's claims against Becker as an individual and her claim that AMHP improperly used her image.

The trial court concluded that AMHP had due cause to terminate Burton. But, it found that all the clients Burton continued to see unilaterally sought her out, and she did not solicit or approach them. It ordered AMHP to pay Burton her withheld salary. It ultimately ordered AMHP to pay $6,259. That amount includes $10,500 for Burton's salary, $962 in medical expenses she incurred while she did not have benefits, and $230 in costs, but is offset against $3,558 she received in unemployment benefits, $1,125 in payments she received from clients during the 60-day severance period, and $750 in sanctions. As described more fully below, there is ambiguity in the trial court's findings and conclusions concerning AMHP's counterclaims for breach of the duty of loyalty and tortious interference. It appears that the trial court found Burton breached her duty of loyalty, but did not commit tortious interference.

AMHP appeals and Burton cross appeals.

## DISCUSSION

AMHP argues that Burton breached her duty of loyalty, that the mandatory remedy for a breach is forfeiture of her entire salary, and that the trial court erred by not concluding that Burton tortiously interfered with AMHP's business expectancies. Burton claims on cross appeal that the trial court should have found that her breach was excused by public policy considerations, that the trial court incorrectly calculated damages, and that she is entitled to double damages and to pursue Becker personally because AMHP willfully withheld wages.

5

I.    Duty of Loyalty

Burton's employment contract contained a noncompetition provision that required her not to "approach" or "solicit" any former clients for three years after leaving AMHP. But, AMHP did not pursue a claim for breach of that provision. Indeed, it appears Burton did not "approach" or "solicit" any former clients. Although Burton continued to see a few former AMHP clients, the trial court found that those clients sought her out, had a close and long-held relationship with Burton, were not interested in disrupting that relationship, and would not have stayed with AMHP after Burton left.[1] Thus, instead of pursuing a claim for breach of the noncompetition provision, AMHP asserted a breach of the common law duty of loyalty.

The specific duty AMHP relies upon stems from Kieburtz & Associates, Inc. v. Rehn, 68 Wn. App. 260, 265-66, 842 P.2d 985 (1992). In that case, we concluded that an implicit duty not to compete may exist even in the absence of a specific contractual duty of noncompetition. Id. In doing so, we outlined the rule provided by Restatement (Second) Agency § 393 (1958). Id. at 265. Specifically, during the period of his or her employment, an employee is not entitled to solicit customers for a rival business or to act in direct competition with his or her employer's business. Id. In like manner, unless otherwise agreed, an agent is subject to a duty not to compete with the principal concerning the subject matter of his agency. Id.

Unlike Burton's contractual noncompetition duty, her duty of loyalty does not extend beyond the period of employment. But, the duty itself is broader because

---

[1] Although AMHP assigns error to that finding, it offers no argument that it is not supported by substantial evidence. Nor does it argue that Burton did, in fact, approach or solicit former AMHP clients.

"noncompetition" is not limited to approaching or soliciting former clients. Several key facts are undisputed. Burton kept at least $1,125 in proceeds she received directly from clients during the 60 days following her notice of termination. She directed the clients to send payment directly to her instead of to AMHP. She did not instruct the clients to formally terminate their relationship with AMHP even though she was aware the clients had signed an agreement with AMHP that required them to do so. Thus, even though the evidence does not establish that Burton breached her contractual noncompetition duty, she did violate an independent common law duty.

II.    Salary Forfeiture

Washington courts have adopted the language of Restatement (Second) Agency § 469, which provides:

> An agent is entitled to no compensation for conduct which is disobedient or is a breach of his duty of loyalty; if such conduct, constitutes a willful and deliberate breach of his contract of services, he is not entitled to compensation even for properly performed service for which no compensation is apportioned.

See, e.g., Cogan v. Kidden, Mathews & Segner, Inc., 97 Wn.2d 658, 667, 648 P.2d 875 (1982); Merkley v. MacPherson's, Inc., 69 Wn.2d 776, 778, 420 P.2d 205 (1966); Kane v. Klos, 50 Wn.2d 778, 789, 314 P.2d 672 (1957): Thus, as a general proposition, an agent or other fiduciary who is unfaithful may be denied compensation. Williams v. Queen Fisheries, Inc., 2 Wn. App. 691, 698, 469 P.2d 583 (1970). But, it is not an inflexible rule and the decision to allow an unfaithful agent or fiduciary to receive compensation rests within the discretion of the court. Id. at 696 n.2, 698; Cogan, 97 Wn.2d at 667. The rationale for placing the decision within the discretion of the court is

7

that the mere fact of breach is not conclusive proof that the agent failed to earn his or her salary or commission. See Williams, 2 Wn. App. at 697.

AMHP nevertheless argues that forfeiture of the agent's entire salary is the mandatory and exclusive remedy. It claims that the court's discretion does not kick in until the agent specifically requests apportionment and points to discrete job functions that were properly performed. It further asserts that it was entitled to a mitigation offset for the amount Burton received from clients even absent a breach of the duty of loyalty.[2] Burton claims that her breach should be excused due to a public policy of allowing clients to choose their providers, and that the trial court erred by not explicitly finding that such a public policy exists.

Despite AMHP's insistence that forfeiture of Burton's entire salary is a mandatory remedy, it can cite to no cases that state complete forfeiture is always required. AMHP instead cites to cases where the court did, in fact, uphold or order complete forfeiture. Those holdings do not conflict with the rule that the decision to award compensation is within the court's discretion. In fact, in Williams we explicitly stated that even though an agent who breaches a duty of loyalty does not have a right or entitlement to compensation, the court may nevertheless exercise its discretion in granting compensation. Id. at 698-99. That conclusion was not, as AMHP argues, limited to the circumstance where an agent triggers the court's discretion by requesting apportionment. Indeed, in Williams an agent was awarded compensation despite

---

[2] AMHP also makes a cursory alternative argument that, even if forfeiture of salary was not justified, its actions can be seen as rightfully terminating Burton's contract early in response to her breach. But, its actions did not take that form. It withheld her entire salary for the two month period.

breaching a duty of loyalty, and there is no suggestion that the agent explicitly requested apportionment. Id. at 699.

AMHP contends that, even if the court's discretion is triggered, apportionment was improper here because Burton "performed no work at all for AMHP during that period." AMHP also argues that the offset for amounts that Burton received from clients had "nothing to do with punishing Burton for her breach of loyalty." The rationale for forfeiture is that an agent is not entitled to compensation for conduct that is disobedient or constitutes a breach of the duty of loyalty. Cogan, 97 Wn.2d at 667. Its purpose is not to impose a penalty. See, e.g., Williams, 2 Wn. App. at 697-98. AMHP and Burton were parties to an employment contract that required AMHP to give 60 days notice of termination. She had a contractual right to her salary during that period and no obligation to perform job functions. In fact, AMHP explicitly instructed her not to perform any job functions. In light of that explicit direction, it is disingenuous to now argue that she could only earn her salary by affirmatively performing work for AMHP. Depriving her of salary on these facts would only serve to punish.

Further, AMHP argues that it would have been entitled to an offset in the absence of a breach of loyalty. It claims that in employment cases, such as employment discrimination and wrongful termination cases, earnings from outside work are deducted from the salary award. While that is true, Burton did not make an employment discrimination claim and had no recovery on her claim for wrongful termination on which to claim an offset. Had there been no breach of loyalty, AMHP would have no claim for any offset because it would not have had a cause of action to pursue. The nature of the outside income, resulting from the breach of loyalty, is the

9

only thing that allowed AMHP to obtain an offset. The terms of Burton's termination required her to answer questions if asked, but not to otherwise perform any work for AMHP. It imposed no obligation to remain completely unemployed. The forfeiture rule does not make every type of employment during the termination period a violation of the duty not to compete or of the duty of loyalty. AMHP cites no authority that would allow it to offset wages Burton earned during the 60 days from employment which did not violate the duty of loyalty or the noncompetition requirements. We disagree that AMHP would have been entitled to the offset absent the breach of loyalty.

Moreover, the clients that Burton treated had already elected to leave AMHP. The only evidence on the issue established that the clients independently elected to leave AMHP when Burton was terminated, and AMHP does not challenge the trial court's finding to that effect. Burton's activities did not violate the contractual noncompetition clause and did not cause the harm to AMHP from loss of clients. This mitigates the egregiousness of her breach. Under these circumstances, the trial court's remedy of offsetting receipts from those clients against the salary she was owed was not an abuse of discretion.

Burton argues that the trial court's remedy is also supported by public policy, and that the trial court erred by not explicitly finding that her breach is excused by public policy considerations. She claims that it is an established public policy that it is the client's right to choose a provider. Whether Washington has established a clear mandate of public policy is a question of law subject to de novo review. Danny v. Laidlaw Transit Servs., Inc., 165 Wn.2d 200, 207, 193 P.3d 128 (2008). To determine whether a clear public policy exists, we consider whether the policy is demonstrated in a

10

constitutional, statutory, or regulatory provision or scheme. Id. at 207-08. Although judicial decisions may establish public policy, we proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject. Id. at 208.

Here, Burton's entire argument is based on a brief statutory reference to the client's responsibility to choose a provider:

> A person licensed under this chapter must provide clients at the commencement of any program of treatment with accurate disclosure information concerning the practice, in accordance with rules adopted by the department, including the right of clients to refuse treatment, the responsibility of clients to choose the provider and treatment modality which best suits their needs, and the extent of confidentiality provided by this chapter. The disclosure information must also include the license holder's professional education and training, the therapeutic orientation of the practice, the proposed course of treatment where known, financial requirements, and such other information as required by rule. The disclosure must be acknowledged in writing by the client and the license holder.

RCW 18.225.100 (emphasis added). From that brief reference, she asserts that she had an obligation to accept her former clients.[3] But, the client's "responsibility" to choose a provider is not the same as the client's "right." Further, that provision merely explains the disclosures that must be made by mental health counselors, marriage and family therapists, and social workers. Id. The disclosures imply a substantive legal

---

[3] Burton also refers the court to the American Mental Health Counselors Association Code of Ethics. But, the portion she cites merely says that she had an ethical obligation not to abandon or neglect her clients, to setup a safety plan for her clients, to refer her clients to appropriate resources, and to contact appropriate support if necessary. AM. MENTAL HEALTH COUNSELORS ASS'N, AMHCA CODE OF ETHICS § I(B)(5) (2010). Those directives did not require her to accept the clients herself or accept the proceeds of treatment sessions while still employed by AMHP. Id. And, this is a legal dispute concerning an employer-employee relationship, not the scope of Burton's ethical obligations.

obligation but do not expressly state one. More significantly, RCW 18.225.100 at best speaks to the client's responsibility to choose a provider, not the provider's obligation to accept clients. It does not follow that a provider must accept every client that chooses it. Burton's policy argument is further weakened by the fact that Washington courts have not held that restrictive covenants between physicians are unenforceable, a fact that unquestionably infringes on clients' right to choose providers. See Emerick v. Cardiac Study Ctr., Inc, 170 Wn. App. 248, 259, 286 P.3d 689, review denied, 175 Wn.2d 1028, 291 P.3d 254 (2012).

The trial court correctly declined to find that Burton's conduct was excused by public policy considerations and appropriately exercised its discretion in awarding Burton her salary.

III.    Tortious Interference

The elements of a claim for tortious interference with contractual or business expectancies are (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference, for an improper purpose or using improper means, inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. Kieburtz, 68 Wn. App. at 267. The trial court concluded, "The first, second, and fourth elements are easily satisfied by the evidence, and the third element is satisfied by Ms. Burton's breach of her duty of loyalty." But, in the next conclusion of law it stated, "AMHP failed to carry its burden of proof on tortious interference with the agency's contractual and business relationships." Regardless of the confusion created by those conflicting

statements, the only conclusion supported by the trial court's findings of fact is that the elements were not met.

Even assuming that Burton's breach of loyalty could constitute intentional interference for an improper purpose or using improper means, there is no evidence that the breach induced the termination of AMHP's relationship with any of the clients in question, or that there was any resultant damage. To the contrary, the undisputed evidence establishes that each of the clients Burton treated independently elected to leave AMHP. Even if Burton should not have accepted the clients, she did not cause the defections. AMHP argues that it clearly established damages, because it presented evidence that Burton received payments from clients that previously provided AMHP with between $4,500 and $10,000 in monthly income. But, the issue is not whether AMHP lost income. It is whether that loss is attributable to Burton's actions. There is no evidence that it is.

IV. Wage Calculations

The trial court based its award on a salary of $10,500 for the 60 day period of lost income and included an offset for $3,558 Burton received in unemployment benefits. Burton challenges both of those amounts.

First, she argues that the trial court miscalculated her salary:

> If one divides the AMHP wages Burton received between January 1, 2009 and July 13, 2009, ($47,747.51) by the amount of calendar days represented, (194), her earnings are $246.12 per calendar day, not per workday. . . .

Burton calculates her gross lost wages amount as 60 days x $246.12 per day for a total of $14,767.27.[4]

But, the amount of $47,747.52 is a vastly inflated salary, because it includes a one-time payout of $7,653.83 for accrued but unused vacation time. That amount was paid, but not all earned, during the January 1 – July 13 timeframe. Further, her calculations include salary paid to Burton on January 15, 2009, which appears to have been earned in December 2008. AMHP's earnings record for Burton states that her gross income per month was $5,250. The trial court properly used that figure in calculating damages. The award is supported by substantial evidence.

Second, Burton argues that the trial court erred by offsetting her award by the unemployment benefits she received. She claims that the offset results in a windfall to AMHP, because the money does not belong to AMHP, and if she was entitled to her salary and thus not unemployed during the 60 day period, then the money does not belong to her either.[5] We agree. Absent a breach of loyalty, if Burton received her salary during the 60 day period and simultaneously obtained unemployment benefits that she was not entitled to, that is an issue between the state and Burton. See RCW 50.20.190 ("An individual who is paid any amount as benefits under this title to which he or she is not entitled shall, unless otherwise relieved pursuant to this section, be liable for repayment of the amount overpaid."). Receipt of those benefits is not a breach of loyalty and AMHP would have no claim to the unemployment benefits. The result does

---

[4] One of the exhibits Burton relies on for these figures is not part of the record on appeal.

[5] AMHP argues that Burton's argument is precluded by the invited error doctrine, because she included an offset for unemployment benefits in her damages calculations. Although Burton did include an offset in discovery responses and in an exhibit containing lost wages calculations, she disputed the offset before the trial court entered its judgment.

not change because of Burton's unrelated breach of loyalty or AMHP's decision to withhold salary. The trial court erred by offsetting Burton's award by the unemployment benefits she received.

V.   Willful Withholding of Wages

In addition to recovering withheld wages, an employee is entitled to double damages and reasonable attorney fees and costs when the wages are willfully withheld. RCW 49.52.050; RCW 49.52.070. And, an officer who violates those provisions may be held personally liable for the violations. RCW 49.52.070. Willful means that the employer knows what it is doing and intends to do what it is doing. Schilling v. Radio Holdings, Inc., 136 Wn.2d 152, 159-60, 961 P.2d 371 (1998). Thus, an employer's failure to pay wages is willful unless it was careless or it erred in failing to pay, or there was a bona fide dispute regarding payment. Id. at 160. A bona fide dispute is a "'fairly debatable' dispute over whether an employment relationship exists, or whether all or a portion of the wages must be paid." Id. at 161 (quoting Brandt v. Impero, 1 Wn. App. 678, 680-81, 463 P.2d 197 (1969)). Whether a bona fide dispute exists is a question of fact that must be supported by substantial evidence. Lilllig v. Becton-Dickinson, 105 Wn.2d 653, 659-60, 717 P.2d 1371 (1986).

Burton argues that she is entitled to double damages for willfully withheld wages and should be able to enforce her claim against Becker individually. AMHP argues that Burton failed to make a timely request for double damages. It is apparent from minute entries that the first time she raised the willful withholding issue below, the trial court orally denied her request. But, there is no written ruling. After the trial court entered its findings of fact and conclusions of law but before it entered its judgment, Burton again

requested double damages. The record does not establish whether the trial court made any ruling on that request, oral or otherwise. The court made no factual finding of willfulness. Failure to make a finding of fact where one is required is presumed to be a negative finding. Fettig v. Dep't of Social & Health Servs., 49 Wn. App. 466, 478, 744 P.2d 349 (1987). Consistent with this presumption, the judgment did not provide double damages.

Even assuming Burton timely sought double damages below, the trial court did not err in denying double damages on the merits. It was not in dispute that AMHP had withheld wages based on an alleged breach of the duty of loyalty. The dispute was as to the legal consequences of that fact. Before AMHP withheld Burton's wages, it asserted a legal justification for doing so. We agree an agent who breaches her duty of loyalty may forfeit her entitlement to some or all of her salary. Whether and how much Burton should forfeit constituted a bona fide dispute, which rested within the discretion of the trial court. AMHP did not willfully withhold wages.

We remand for the trial court to correct its judgment by removing the offset for unemployment benefits. We otherwise affirm.

Appelwick, J.

WE CONCUR:

Spearman, J.                    Leach, C.J.

16